CLERK'S OFFICE
A TRUE COPY
Jan 24, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Information associated with certain cellular towers ("cell towers") that are in the possession, custody, and/or control of Verizon Wireless, as further described in Attachment A

Case No. 25-M-323 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 2-7-25 *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for ____ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ______.

Date and time issued: 1-24-25. 11:50 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magitstrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

Records and information associated with communications to and from the following cellular antenna towers ("cell towers") on the identified date(s) and timeframe(s) that are within the possession, custody, or control of the cellular service provider(s) identified below:

| **Cell Towers** | **Dates** | **Times (CST)** |
|---|---|---|
| The cell towers that provided cellular service to geo-location:<br><br>45.05560 °N, -87.72249 °W<br><br>The latitude and longitude of Peshtigo Hometown Pharmacy (960 Frontage Road, Peshtigo, WI 54157) | **April 12, 2024, to April 13, 2024** | 6:10 p.m. (April 12, 2024) to 8:50 a.m. (April 13, 2024) |
| The cell towers that provided cellular service to geo-location:<br><br>45.30071 °N, -88.52980 °W<br><br>The latitude and longitude of Nicolet Pharmacy (15481 Commercial Road, Ste. A, Lakewood, WI 54138) | **November 7, 2024, to November 8, 2024** | 5:40 p.m. (November 7, 2024) to 8:50 a.m. (November 8, 2024) |
| The cell towers that provided cellular service to geo-location:<br><br>44.35821 °N, -89.10366 °W<br><br>The latitude and longitude of Waupaca Hometown Pharmacy (115 N. Western Avenue, Unit 8, Waupaca, WI 54981) | **December 9, 2024, to December 10, 2024** | 6:10 p.m. (December 9, 2024) to 7:50 a.m. (December 10, 2024) |
| The cell towers that provided cellular service to geo-location:<br><br>44.25819 °N, -88.32551 °W<br>The latitude and longitude of Kimberly Hometown Pharmacy | **December 11, 2024, to December 12, 2024** | 6:10 p.m. (December 11, 2024) to 8:50 a.m. (December 12, 2024) |

| | | |
|---|---|---|
| (W2721 Brookhaven Drive, Appleton, WI 54915) | | |
| The cell towers that provided cellular service to geo-location:<br><br>43.44502 °N, -88.64897 °W<br><br>The latitude and longitude of Marshland Pharmacy (700 Washington Street, Horicon, WI 53032) | **December 11, 2024, to December 12, 2024** | 7:10 p.m. (December 11, 2024) to 4:30 a.m. (December 12, 2024) |

The following cellular service provider(s) are required to disclose information to the United States pursuant to this warrant:

1. Verizon Wireless, a cellular service provider headquartered in 180 Washington Valley Road, Bedminster, New Jersey.

2. T-Mobile USA, a cellular service provider headquartered in 4 Sylvan Way, Parsippany, New Jersey.

3. AT&T, a cellular service provider headquartered in 11760 US Highway 1, Suite 300, North Palm Beach, Florida.

**ATTACHMENT B**

**Particular Things to be Seized.**

## I. Information to be Disclosed by the Provider

For each cell tower in described in Attachment A, the cellular service providers identified in Attachment A are required to disclose to the United States records and other information (not including the contents of communications) about all communications made using the cellular tower(s) identified in Attachment A during the corresponding timeframe(s) listed in Attachment A, including records that identify:

a. the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

b. for each communication, the "sector(s)" (i.e. the face(s) of the tower(s)) that received a radio signal from the locally served wireless device;

c. the date, time, and duration of each communication

These records should include records about communications that were initiated before or terminated after the timeframe(s) identified in Attachment A if some part of the communication occurred during the relevant timeframe(s) listed in Attachment A.

**II. Information to be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of Title 21 United States Code, Sections 841 and 846 and Title 18 United States Code, Section 2118(b) during the period of 6:10 p.m. on April 12, 2024 to 8:50 a.m. a.m. on April 13, 2024, 5:40 p.m. on November 7, 2024 to 8:30 a.m. on November 8, 2024, 6:10 p.m. on December 9, 2024 to 7:50 a.m. on December 10, 2024, and 6:10 p.m. on December 11, 2024 to 8:50 a.m. on December 12, 2024.

Law enforcement will not take further investigative steps with regards to identifiers collected from the cellular providers, including issuing grand jury subpoenas relating to those identifiers, except for identifiers related to devices that utilized cellular towers at more than one of the locations and time pairs described in Attachment A.

CLERK'S OFFICE
A TRUE COPY
Jan 24, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with certain cellular towers ("cell towers") that are in the possession, custody, and/or control of Verizon Wireless, as further described in Attachment A

Case No. 25-M-323 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ____________ District of ____________ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| 21 U.S.C. §§ 846 & 841(a)(1); and 18 U.S.C. § 2118(b) | Conspiracy to possess with intent to distribute and distribute controlled substances; and Burglary of pharmacy to steal controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

❒ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

COLEMAN WILLIAMS Digitally signed by COLEMAN WILLIAMS Date: 2025.01.23 10:43:42 -06'00'

*Applicant's signature*

Coleman Williams, DEA SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 1-24-25

Stephen C. Dries

*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Coleman J. Williams, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND INVESTIGATOR BACKGROUND

1. I make this affidavit in support of an application for a warrant for records and information associated with certain cellular towers ("cell towers") that is in the possession, custody, and/or control of Verizon Wireless, a cellular service provider headquartered in 180 Washington Valley Road, Bedminster, New Jersey; T-Mobile USA, a cellular service provider headquartered in 4 Sylvan Way, Parsippany, New Jersey; and AT&T, a cellular service provider headquartered in 11760 US Highway 1, Suite 300, North Palm Beach, Florida. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless, T-Mobile USA, and AT&T to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since June 2020. I am currently assigned to the DEA Milwaukee District Office. As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking and money laundering offenses,

including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved in electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. Prior to my employment with the Drug Enforcement Administration, I was employed as a Special Agent with the United State Secret Service for approximately 2 years and ten months.

3. I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. More specifically, my training and experience includes the following:

a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, fentanyl and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare

controlled substances for sale. I know the street values of different quantities of the various controlled substances;

d. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

e. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

f. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

g. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking;

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials; and

i. I am familiar with the ways in which drug traffickers conduct business, including, but not limited to, their methods of importing and distributing controlled substances, their use of cellular telephones, their used of computers and smart phones and their use of numerical codes and code words to conduct their transactions. I have participated in the interviewing and debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of obtaining drugs, distribution, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking. I have learned from other law enforcement investigators about these matters as well.

4. Based on my training, experience, and conversations with other experienced narcotics investigators, I have gained insight into the techniques and methods used by drug traffickers to distribute controlled substances, their use of

cellular phones and other electronic communication devices to facilitate their trafficking activity, and the methods used to conceal and launder the proceeds of said activity. I have also been involved in multiple investigations where drug traffickers utilized online applications, such as Facebook, to communicate with each other and coordinate their drug trafficking activities.

5. I know from training and experience in the field of drug enforcement that individuals involved in crimes of possession for sale, sales, and transportation of controlled substances (including pharmaceutical products) often utilize cellular telephones and text messaging to arrange their crimes or coordinate with co-conspirators. Numerous times, drug dealers place these telephones in the names of family, friends, or fictitious names, and/or purchase unsubscribed prepaid cellular telephones to avoid detection. Another technique often used by drug traffickers to avoid detection is the use of coded conversations and vague terminology to discuss drug transactions. For example, rather than use the words "drugs," "narcotics," or "oxycodone," drug dealers will use a variety of different code words. Similarly, drug traffickers will often use vague terms in order to avoid talking about specific locations, currency, and drug amounts.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses including DEA Diversion Investigator Laurie Kaufmann who has extensive experience investigating pharmacy burglaries. This affidavit is intended to show merely that there

is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 United States Code, Sections 841 and 846, Title 18 United States Code, Section 2118(b) have been committed by Killrain J. RANDOLPH, Marces L. RANDOLPH, Curtis G. Solomon, Malcolm J. AUSTIN, and other unidentified co-conspirators. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

8. In December of 2024, local authorities reached out to the DEA Milwaukee District Office regarding what appears to be a string of pharmacy burglaries resulting in the theft of significant amounts of controlled substances and attempted burglaries that occurred in the Eastern District of Wisconsin and appear to be committed by the same group of individuals.

9. On December 10, 2024, Waupaca Hometown Pharmacy, located at 115 N. Western Avenue, Unit 8, in Waupaca, Wisconsin was burglarized. The investigation revealed that the burglars cut a hole through an exterior wall to enter the pharmacy. The burglars obtained 77 Schedule II controlled substance products, and 3 Schedule IV controlled substance products, at a cost to the pharmacy of approximately $18,568. The Waupaca Police Department identified two suspicious SUVs that were in the area of the pharmacy, including a Mitsubishi Outlander with an Arizona license plate rented by Killrain RANDOLPH and a Nissan Rouge with Texas license plates rented by someone

identified, via a Facebook query, to be an acquaintance of RANDOLPH. A nationwide Flock camera search was conducted on these license plates and it was determined that both had traveled from Texas to Wisconsin. Waupaca Hometown Pharmacy (Waupaca, WI). The investigation revealed that this burglary occurred sometime between December 9, 2024, at approximately 6:08 p.m. when the pharmacy was closed for the evening, and December 10, 2024, at approximately 7:38 a.m. when it was discovered.

10. On approximately December 11, 2024, or during the very early morning hours of December 12, 2024, a burglary was attempted at Kimberly Hometown Pharmacy, located at W2721 Brookhaven Drive in Buchanan, Wisconsin. The hole that was cut into the back of the building led to a stock room, not the pharmacy, and it appears at that point the burglars aborted their planned burglary of the pharmacy. Outagamie County Sheriff's reports reveal that this burglary attempt was made between December 11, 2024, at 6:10 p.m. when the pharmacy was closed for the evening, and December 12, 2024, at 9:00 a.m. when the pharmacy opened for business. Pharmacy personnel did not originally notice the hole during the morning on December 12, 20204 until approximately 10:30 a.m. when they were investigating why the temperature in the back room was significantly colder and discovered the hole in the wall.

11. On December 12, 2024, Marshland Pharmacy, located at 700 Washington Street in Horicon, Wisconsin was burglarized. The investigation revealed that the burglars cut a hole in the back of the building to enter the pharmacy. Although the burglars tripped an alarm in the pharmacy at approximately 4:01 a.m., the burglars

obtained 44 Schedule II controlled substance products, 6 Schedule III controlled substance products, 10 Schedule IV controlled substance products, and 12 Schedule V controlled substance products, at a cost to the pharmacy of approximately $17,248. A Detective from the Waupaca Police Department noted that Flock cameras captured the suspect vehicles, i.e., the Nissan Rogue with Texas plates and the Mitsubishi Outlander with Arizona plates, plates around the pharmacy at the same time the burglary in Horicon was occurring.

12. Continued monitoring of Flock cameras captured the Nissan Rogue later in the day on December 12, 2024, in Glendale, Wisconsin. The vehicle was subsequently located by Glendale Police Officers in the southside of the parking lot at the La Quinta Inn & Suites, located at 5423 N. Port Washington Road, Glendale. Glendale Police Officers approached the Nissan Rogue and cleared it. Another Glendale Officer then arrived in a marked squad and blocked the vehicle in and as she was doing so, she advised that she observed two black male subjects, one wearing a mustard-colored sweatsuit and one wearing a black parka with a fur hood who appeared to be walking around the corner, i.e., approaching the Nissan Rogue; however, immediately upon seeing her and the marked squad, the two black male subjects walked back inside the hotel. As officers entered the lobby of the hotel, the subject in the mustard-colored sweatsuit was observed on the second floor.

13. The front desk clerk at the hotel advised that the subject in the mustard-colored sweatsuit was associated with Room 220. Other officers were then notified of this information and went to Room 220. While standing outside of Room 220, officers

heard voices coming from the room. At this time, Glendale officers were also speaking on the phone and receiving information from the Waupaca Police Department and Glendale Lieutenant Hoffman received a still image of a suspect from the Waupaca pharmacy burglary, which matched a subject who was in the hotel lobby. Officers then responded to the hotel lobby to make contact with this subject, who was subsequently identified as Killrain RANDOPH, (dob 6/16/1990), and he was detained while he was holding a black iPhone with a clear case in his right hand, and he was eventually then placed under arrest.

14. A Glendale officer who was then reviewing hotel surveillance video, observed four subjects, including RANDOLPH, in the hallway together, and it appeared that one of the subjects had a firearm magazine potentially sticking out of his jeans pocket. At this point, the officers believed that there were three additional occupants inside room #220. Officers then went to room #220, which was rented by Malcolm AUSTIN, and encountered two individuals, subsequently identified as Marces RANDOLPH, and Malcolm AUSTIN, both of whom were slightly argumentative about why officers were at the door. Due to the belief that there were three occupants in the room and were known violent, potentially armed gang members, according to information relayed to them regarding the burglary suspects, officers entered the room to conduct a protective sweep and to locate the third individual. Upon entry, officers observed the toilet full of medication bottle labels that appeared to be removed from medication bottles that were also present in the hotel room, and a fentanyl packaging label through a pillowcase. At this time, Marces RANDOLPH and AUSTIN were

placed under arrest due to the large amount of narcotics. At this time, officers stayed in the room to wait for a state search warrant to be prepared and signed.

15. A Glendale officer then took AUSTIN to his squad car and secured him in the backseat. After doing so, a Whitefish Bay Police Officer advised that officer that he had observed a black male subject wearing a mustard-colored sweatsuit get into the backseat of a Ford SUV near the entrance. The subject wearing the mustard-colored sweatsuit, later identified as Curtis G SOLOMON (dob: 8/20/1989), was then detained and subsequently taken into custody by a Glendale police officer. Officers obtained state search warrants for the two vehicles recovered, i.e., the Nissan Rogue and the Mitsubishi Outlander, which revealed the following: a Stihl brand concrete saw and a Dewalt carrying bag with unknown tools in it, believed to be burglary tools.

16. Officers obtained a state search warrant to search Room #220 and recovered fentanyl strips, a Schedule II controlled substance as well as numerous empty medication bottles, many that still had stickers and labels indicating that they were from the Marshland Pharmacy. All of the medication bottles recovered from the hotel room were identified by Marshland Pharmacy as being taken during the above-described burglary. The fentanyl strips that were recovered were not taken from the Marshland Pharmacy. During the search of room #220 officers also recovered an iPad with a yellow and black case, which was sitting on top of one of the beds.

17. Case agents further discovered that there were two additional pharmacy burglaries in the Eastern District of Wisconsin in 2024 in which the burglars entered the pharmacy by cutting a hole in the building.

18. On April 13, 2024, Peshtigo Hometown Pharmacy, located at 960 Frontage Road in Peshtigo, Wisconsin was burglarized in this manner and the burglars obtained 72 Schedule II controlled substance products, and 2 Schedule III controlled substance products, at a cost to the pharmacy of approximately $37,732. The report indicated that on April 14, 2024, at approximately 8:30 a.m., a concerned citizen reported noticing the damage to Peshtigo Hometown Pharmacy. Pharmacy employees arrived for work and discovered that the pharmacy was broken into overnight. Metal siding panels had been pried apart to allow holes to be cut through two areas in the exterior wall of the building. One hole was made where there was shelving that prevented entry. Another hole went through the wall and unknown suspects were able to enter the building by bypassing exterior doors and windows, which often have some sort of alarms attached to them. Once inside, the unknown suspects pried open a locked cabinet located under a counter and stole the majority of the pharmacy's Schedule II controlled substances.

19. Peshtigo Hometown Pharmacy had interior motion activated surveillance cameras, but the cameras failed to activate. The burglary would have occurred between 6:00 p.m. on April 12, 2024, when the pharmacy was locked up for the night, and 8:30 am on April 13, 2024, when the burglary was discovered. Peshtigo Police Department obtained video surveillance footage from a nearby business that shows a light-colored SUV drive back and forth past the businesses four times from 12:11 a.m. to 12:28 a.m. on April 12, 2024. Another nearby business's camera captured a light-colored SUV driving in the direction of Peshtigo Hometown Pharmacy at 12:11 a.m. on April 13, 2024. A witness also reported that she saw two light-colored SUVs with Texas license plates as

she drove to Peshtigo Vet to pick up her dogs around 12:15 a.m. on April 13, 2024. The Peshtigo Police Department has not apprehended any suspects for this burglary.

20. Additionally, case agents discovered reports that on November 8, 2024, Nicolet Pharmacy, located at 15481 Commercial Road, Ste A in Lakewood, Wisconsin was also burglarized in this manner, and the burglars obtained 49 Schedule II controlled substance products, at a cost to the pharmacy of approximately $22,214. Oconto County Sheriff's Office reports reveal that the burglary was discovered at approximately 8:06 a.m. by employees who arrived for work. A hole had been cut into metal siding and a hole made through Tyvek, plywood, insulation, and drywall to gain access to the pharmacy storage room where a medicine cabinet had been forced open and the lock broken. The pharmacy had interior cameras, but they failed to capture any activity. The burglary would have occurred between November 7, 2024, at 5:55 p.m. when employees locked up, armed the alarm, and left pharmacy and November 8, 2024, at approximately 8:06 a.m., when the burglary was discovered. The Oconto County Sheriff's Department has not apprehended any suspects for this burglary and there is no vehicle information.

21. At the time of their arrests, the individuals had cell phones on their persons, and the phone number provided by Killrain RANDOLPH during the booking process is the same number he used when renting the Mitsubishi Outlander. Phone numbers for the other individuals, Marces RANDOLPH, Malcolm AUSTIN, and Curtis SOLOMON, are not yet known. Although case agents are simultaneously submitting an application to search the contents of the phones recovered during Killrain

RANDOLPH, Marces RANDOLPH, AUSTIN, and SOLOMON's arrests, it is unknown whether case agents will be able to unlock and search all of the phones and be able to determine the phone numbers of those phones.

22. Killrain RANDOPLH has also been linked to multiple pharmacy burglaries in South Dakota and North Dakota.

23. Based upon my training and experience, the investigation to date, and the facts set forth above, probable cause exists to believe that evidence of the pharmacy burglaries at Peshtigo Hometown Pharmacy, Nicolet Pharmacy, Waupaca Hometown Pharmacy, and Marshland Pharmacy and the attempted burglary at Kimberly Hometown Pharmacy will be recovered from the requested cell tower dumps directed to AT&T Wireless, Verizon Wireless, and T-Mobile cell towers.

24. Based on my training and experience, it is common for pharmacy burglars to conduct a reconnaissance of their intended target pharmacies to determine the storage location of pharmaceuticals drugs with high street values. Based on my training and experience, I believe that a majority of American adults possess a cellular phone, and/or a "smartphone" (a phone capable of connecting to the internet and downloading mobile applications, among other things). I also know that it is common for drug traffickers to utilize cellular telephones and text messaging to arrange their crimes or coordinate with co-conspirators. Based on my experience investigating pharmacy burglaries, it is common for a co-conspirator, who is sitting outside in the suspect vehicle who acts as a "look out" while other suspects break into the pharmacies, to maintain constant communication by phone to alert the suspects inside the pharmacy

of any danger. The information provided by the Wireless Providers will be searched in efforts to identify cellular telephones which connected to the applicable cell towers in the above-mentioned area during the time frame of the criminal activity. Additionally, based upon my training and experience, case agents are aware that those individuals engaged in committing crimes typically use multiple cellular phones, including burner phones, as opposed to their personal phones.

25. From my knowledge and experience, I know that Peshtigo, Lakewood, Waupaca, Buchanan, and Horicon are small towns which have minimal automobile traffic activity during the very early hours of the morning, such as when the burglaries are suspected to have occurred. Attachment A specifically identifies the target location of the burglarized pharmacies. The time period identified in Attachment A for the target locations includes a period of time prior to and after when the crime was committed.

26. In my training and experience, I have learned that Verizon Wireless, T-Mobile USA, and AT&T are companies that provides cellular communications service to the general public. In order to provide this service, many cellular service providers maintain antenna towers ("cell towers") that serve and provide cellular service to devices that are within range of the tower's signals. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. By communicating with a cell tower, a wireless device can transmit and receive communications, such as phone calls, text messages, and other data. When sending or

receiving communications, a cellular device does not always utilize the cell tower that is closest to it.

27. Based on my training and experience, I also know that each cellular device is identified by one or more unique identifiers. For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The types of identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

28. Based on my training and experience, I know that cellular providers, such as Verizon Wireless, T-Mobile USA, and AT&T, routinely and in their regular course of business maintain historical records that allow them to determine which wireless devices used cellular towers on the cellular provider's network to send or receive communications. For each communication sent or received via the wireless provider's network, these records may include: (1) the telephone call number and unique identifiers of the wireless device that connected to the provider's cellular tower and sent or received the communication ("the locally served wireless device"); (2) the cellular tower(s) on the provider's network, as well as the "sector" (*i.e.*, face of the tower), to which the locally served wireless device connected when sending or receiving the

communication; and (3) the date, time, and duration of the communication. These records may also include the source and destination telephone numbers associated with the communication (including the number of the telephone that was called or that called the locally served wireless device) and the type of communication (e.g., phone call or SMS text message) that was transmitted.

29. Based on my training and experience, I know that cellular providers, such as Verizon Wireless, T-Mobile USA, and AT&T have the ability to query their historical records to determine which cellular device(s) connected to a particular cellular tower during a given period of time and to produce the information described above. I also know that cellular providers have the ability to determine which cellular tower(s) provided coverage to a given location at a particular time, specifically, those referenced in Attachment A.

30. Based on my training and experience and the above facts, information obtained from cellular service providers such as Verizon Wireless, T-Mobile USA, and AT&T reveals which devices used a particular cell tower (and, where applicable, sector) to engage in particular communications can be used to show that such devices were in the general vicinity of the cell tower at the time the communication occurred. Thus, the records described in Attachment A will identify the cellular devices that were in the vicinity of the pharmacy during the time of the burglary. This information, in turn, will assist law enforcement in determining which person(s) were present at the pharmacy burglary.

31. Law enforcement will not take further investigative steps with regards to identifiers collected from the cellular providers, including issuing grand jury subpoenas relating to those identifiers, except for identifiers related to devices that utilized cellular towers at more than one of the locations and time pairs described in Attachment A.

32. After investigators complete the review of the requested data, law enforcement will cease the review of any information pertaining to third parties deemed not involved in the offense absent further order of the court.

## AUTHORIZATION REQUEST

33. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c).

34. I further request that the Court direct Verizon Wireless, T-Mobile USA, and AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon Wireless, T-Mobile USA, and AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

**ATTACHMENT A**

**Property to Be Searched**

Records and information associated with communications to and from the following cellular antenna towers ("cell towers") on the identified date(s) and timeframe(s) that are within the possession, custody, or control of the cellular service provider(s) identified below:

| Cell Towers | Dates | Times (CST) |
|---|---|---|
| The cell towers that provided cellular service to geo-location:<br><br>45.05560 °N, -87.72249 °W<br><br>The latitude and longitude of Peshtigo Hometown Pharmacy (960 Frontage Road, Peshtigo, WI 54157) | **April 12, 2024, to April 13, 2024** | 6:10 p.m. (April 12, 2024) to 8:50 a.m. (April 13, 2024) |
| The cell towers that provided cellular service to geo-location:<br><br>45.30071 °N, -88.52980 °W<br><br>The latitude and longitude of Nicolet Pharmacy (15481 Commercial Road, Ste. A, Lakewood, WI 54138) | **November 7, 2024, to November 8, 2024** | 5:40 p.m. (November 7, 2024) to 8:50 a.m. (November 8, 2024) |
| The cell towers that provided cellular service to geo-location:<br><br>44.35821 °N, -89.10366 °W<br><br>The latitude and longitude of Waupaca Hometown Pharmacy (115 N. Western Avenue, Unit 8, Waupaca, WI 54981) | **December 9, 2024, to December 10, 2024** | 6:10 p.m. (December 9, 2024) to 7:50 a.m. (December 10, 2024) |
| The cell towers that provided cellular service to geo-location:<br><br>44.25819 °N, -88.32551 °W<br>The latitude and longitude of Kimberly Hometown Pharmacy | **December 11, 2024, to December 12, 2024** | 6:10 p.m. (December 11, 2024) to 8:50 a.m. (December 12, 2024) |

| | | |
|---|---|---|
| (W2721 Brookhaven Drive, Appleton, WI 54915) | | |
| The cell towers that provided cellular service to geo-location:<br><br>43.44502 °N, -88.64897 °W<br><br>The latitude and longitude of Marshland Pharmacy (700 Washington Street, Horicon, WI 53032) | **December 11, 2024, to December 12, 2024** | 7:10 p.m. (December 11, 2024) to 4:30 a.m. (December 12, 2024) |

The following cellular service provider(s) are required to disclose information to the United States pursuant to this warrant:

1. Verizon Wireless, a cellular service provider headquartered in 180 Washington Valley Road, Bedminster, New Jersey.

2. T-Mobile USA, a cellular service provider headquartered in 4 Sylvan Way, Parsippany, New Jersey.

3. AT&T, a cellular service provider headquartered in 11760 US Highway 1, Suite 300, North Palm Beach, Florida.

## ATTACHMENT B

## Particular Things to be Seized.

**I. Information to be Disclosed by the Provider**

For each cell tower in described in Attachment A, the cellular service providers identified in Attachment A are required to disclose to the United States records and other information (not including the contents of communications) about all communications made using the cellular tower(s) identified in Attachment A during the corresponding timeframe(s) listed in Attachment A, including records that identify:

a. the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

b. for each communication, the "sector(s)" (i.e. the face(s) of the tower(s)) that received a radio signal from the locally served wireless device;

c. the date, time, and duration of each communication

These records should include records about communications that were initiated before or terminated after the timeframe(s) identified in Attachment A if some part of the communication occurred during the relevant timeframe(s) listed in Attachment A.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21 United States Code, Sections 841 and 846 and Title 18 United States Code, Section 2118(b) during the period of 6:10 p.m. on April 12, 2024 to 8:50 a.m. a.m. on April 13, 2024, 5:40 p.m. on November 7, 2024 to 8:30 a.m. on November 8, 2024, 6:10 p.m. on December 9, 2024 to 7:50 a.m. on December 10, 2024, and 6:10 p.m. on December 11, 2024 to 8:50 a.m. on December 12, 2024.

Law enforcement will not take further investigative steps with regards to identifiers collected from the cellular providers, including issuing grand jury subpoenas relating to those identifiers, except for identifiers related to devices that utilized cellular towers at more than one of the locations and time pairs described in Attachment A.